IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KATHLEEN McNALLY, | ) | CIV. NO. 09-00363 SOM/KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTIONS TO |
| vs. | ) | CONTINUE; ORDER STRIKING |
| | ) | PLAINTIFF'S EXPERT; ORDER |
| UNIVERSITY OF HAWAII; et al. | ) | GRANTING MOTIONS FOR SUMMARY |
| | ) | JUDGMENT |
| Defendants. | ) | |
| _____ | ) | |

ORDER DENYING MOTIONS TO CONTINUE; ORDER STRIKING PLAINTIFF'S
EXPERT; ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

I.    INTRODUCTION.

Before the court are Defendants' motions for summary
judgment.  The court grants the motions on the ground that
McNally fails to raise genuine issues of fact that would preclude
judgment as a matter of law.

Plaintiff Kathleen McNally alleges that she was not
retained as the Athletic Director of Defendant University of
Hawaii at Hilo ("UHH") on the Big Island of Hawaii because she
had complained about violations of Title IX.  McNally claims to
have been terminated for complaining that her salary was not
equal to that of the male Athletic Director of the University of
Hawaii at Manoa ("UHM") and that she had not received a multi-
year contract.

McNally sues 1) UHH, 2) Rose Tseng, UHH's Chancellor,
3) Keith Miser, UHH's Vice Chancellor of Student Affairs,

4) Luoluo Hong, Miser's replacement as UHH's Vice Chancellor of Student Affairs, 5) Bill Chen, UHH's Vice Chancellor for Administration, and 6) Alyson Y. Kakugawa-Leong, UHH's Director of Media Relations. Tseng, Miser, Hong, Chen, and Kakugawa-Leong (collectively "Individual Defendants") are named in both their individual and official capacities. The Complaint asserts violations of Title IX (Cause of Action I), §§ 1981 and 1981A (Cause of Action II), § 1983 (Cause of Action III), and section 378-2 of the Hawaii Revised Statutes (Cause of Action IV). The Complaint also asserts claims for intentional infliction of emotional distress ("IIED") (Cause of Action V) and slander and libel (Cause of Action VI), and seeks punitive damages.

UHH and the Individual Defendants have filed separate motions for summary judgment. The motions are granted.

The court denies McNally's requests for a continuance to take discovery, as McNally fails to demonstrate that she has diligently pursued discovery in the past and fails to show why such discovery is necessary to oppose the present motions.

The court strikes the declaration of Christine Grant, McNally's expert who purports to state facts and who fails to demonstrate any expertise making her opinions helpful to a decisionmaker.

II.     BACKGROUND.

McNally received an executive appointment to be UHH's athletic director in January 2001.  See University of Hawaii Payroll Notification Form, ECF No. 39-2.  McNally's appointment was not renewed in 2008.

McNally filed the present Complaint on August 7, 2009, naming UHH and various individuals as defendants.

McNally sues Keith Miser, the former Vice Chancellor of Student Affairs at UHH who now works for UHH's Chancellor.  Miser worked with UHH's athletic department with respect to its program and budget issues.  Miser also did McNally's annual employment evaluations and performance reviews.  See Declaration of Keith Miser, Oct. 20, 2010, ECF No. 39-13.  At the hearing on the present motions, McNally explained that she is suing Miser because he wanted to use $500,000 that the state legislature had appropriated for UHH's Title IX compliance for UHH's general expenses, not for things directly related to Title IX compliance.  Although at one point McNally alleged that Miser had spoken about a desire to hire a "Japanese Male," see Complaint ¶ 14, McNally later clarified that she is not charging Miser with any wrongdoing in that regard, as she has concluded that Miser made no such statement.  See ECF Nos. 72-36 and 72-37.

McNally sues Luoluo Hong, Miser's replacement as the Vice Chancellor for Student Affairs at UHH.  Hong joined UHH in

that position on January 1, 2008.  See Declaration of Luoluo
Hong, Oct. 20, 2010, ECF No. 39-19; Deposition of Kathleen
McNally at 276, Dec. 8, 2010, ECF No. 80-3.

McNally sues Rose Tseng, the retired Chancellor of UHH.
See Deposition of Rose Tseng at 5, Dec. 14, 2010, ECF No. 80-6
(indicating that Tseng retired at the end of June 2010).

McNally sues Bill Chen, the Vice Chancellor for
Administration of UHH.  McNally says that Chen, along with Tseng
and Miser, refused to increase UHH's athletic budget to address
Title IX issues.  See Complaint ¶¶ 6, 18.  At the hearing on the
present motions, McNally clarified that Chen is named as a
Defendant because he was in charge of UHH's budget and because
McNally allegedly suffered retaliation after complaining about
UHH's use of $500,000 designated for Title IX compliance for
other UHH expenses.

McNally sues Alyson Y. Kakugawa-Leong, UHH's Director
of Media Relations, asserting that she made slanderous and
libelous statements in press releases about McNally's
termination.  McNally clarified at the hearing and in her
deposition that she is suing Kakugawa-Leong only for defamation,
not for actions violative of Title IX or any other law.  See also
Deposition of Kathleen McNally at 202-03, Dec. 8. 2010, ECF No.,
80-3.  McNally presents no direct evidence of what Kakugawa-Leong
actually said and is instead relying on a newspaper article to

4

show that Kakagawa-Leong made statements about McNally.  As discussed below, however, the newspaper does not actually state that Kakugawa-Leong made any such statement.

There is no dispute that, in the first years of her employment, McNally received favorable employment reviews and merit raises.  Over time, the reviews indicated increasing concern regarding fiscal spending and budgetary shortfalls.  <u>See</u> ECF No. 39-14 (positive performance review for 2002-03 academic year); ECF No. 39-15 (positive performance review for 2003-04 academic year); ECF No. 39-8 (merit raise effective July 1, 2004); ECF No. 39-16 (generally positive performance review for 2004-05 academic year); ECF No. 39-9 (merit raises effective July 1, 2006); ECF No. 39-17 (mostly positive performance review for 2005-06 year, but notation that UHH's athletic department failed to stay within budget and was expected to run a $40,000 to $80,000 deficit for the 2005-06 fiscal year as a result of many purchases that did not use the requisition system); ECF No. 39-10 (merit raise effective July 1, 2007); ECF No. 39-18 (performance review for 2006-07 year noting concerns about management, planning, and financial stability and telling McNally to reduce expenditures to keep them within the operating budget, and also noting that expenses had skyrocketed in every department and that the athletic department had to adjust its budget to control spending).

In 2006, McNally asked UHH to review her salary, saying that it was her fourth such request in four years. McNally argued that she should receive compensation equal to that of the Athletic Director of UHM, the university's flagship campus located in Honolulu. The UHM athletic director was a male who was paid significantly more than McNally. McNally also requested a five-year contract. <u>See</u> Letter from Kathleen McNally to Rose Tseng, Aug. 4, 2006, ECF No. 39-11.

On October 10, 2006, UHH responded to McNally's request that her compensation be equivalent to that of UHM's Athletic Director and to the request for a multi-year contract. UHH's Director of Human Resources, Kerwin Iwamoto, told McNally that McNally's responsibilities, scope of work, number of personnel, and budget were not comparable to those of UHM's Athletic Director, as UHM was a larger, NCAA Division I school, with a much larger athletic department. Iwamoto told McNally that "Salary comparisons in the UH system use the CUPA salary scales for comparisons" and that McNally's salary was above the 40th percentile for institutions of similar size and character. Iwamoto told McNally that no executive/managerial employee at UHH, including the Chancellor, had a multi-year contract. <u>See</u> Letter from Kerwin Iwamoto to Kathleen McNally, Oct. 10, 2006, ECF No. 39-12.

As of January 28, 2008, UHH was projecting a deficit of $453,763 for its athletic department.  See Email from Lois Fujiyoshi to many recipients, including Kathleen McNally, Jan. 28, 2008, ECF Nos. 72-33 and 80-4.  Defendants' Concise Statement alleges that McNally was informed of this projected deficit.  See Concise Statement ¶ 41, ECF No. 80.  McNally does not controvert these assertions relating to the projected deficit in her own concise statement.  Accordingly, pursuant to Local Rule 56.1(g), they are deemed admitted.

On January 30, 2008, newly hired Hong sent McNally an email, telling McNally to take certain actions to minimize the current fiscal year's deficit and to ensure that no deficit occurred in the 2008-09 fiscal year.  See Email from Luoluo Hong to Kathleen McNally, Jan. 30, 2008, ECF No. 39-20.  Via a separate email the same day, Hong suspended McNally's "signing authority" while UHH sought to manage its budget.  See Email from Luoluo Hong to Kathleen McNally, Jan. 30, 2008, ECF No. 39-21.

On February 8, 2008, Hong sent an email to all of UHH's coaches, informing them that Hong and McNally had met and discussed fiscal matters.  Hong told the coaches that, effective immediately, all coaches, as well as the Associate Director and Business Manager, were to report directly to Hong, and that all decisions affecting the budget required consultation with Hong.

<u>See</u> Email from Luoluo Hong to various coaches, Feb. 8, 2008, ECF No. 39-23.

On February 19, 2008, Hong sent McNally a letter saying that, because it was virtually impossible for McNally to do anything that would not affect UHH's budget, McNally was to "refrain from participating substantively in any administrative activities." <u>See</u> Letter from Luoluo Hong to Kathleen McNally, Feb. 19, 2008, ECF No. 39-25.

On March 1, 2008, the Hawaii Tribune Herald ran a newspaper story about a purported UHH projected budget shortfall of $500,000. <u>See</u> Paul Freelend, <u>Vulcans facing budget shortfall</u>, Haw. Tribune Herald, March 1, 2008, at B1 and B4, ECF No. 72-7. The article stated: "A projected $500,000 budget shortfall resulted in reorganization within the department and cost-cutting measures." The article did not state the source of the information about the $500,000 shortfall. The article said that Defendant Alyson Kakugawa-Leong had indicated that spending was being controlled by Hong instead of McNally. The article reported, "This is not the first time the athletic department has gone over budget . . . , but it is the program's largest-ever deficit." <u>Id.</u>

McNally sent an email to the paper, complaining about inaccuracies in the article. On March 9, 2008, the Hawaii Tribune Herald ran a story about this email. <u>See</u> Bill O'Rear,

8

<u>Vulcans AD takes issue with budget story</u>, March 9, 2008, at B1 and B5.  This story did not state that McNally had complained that the report about the $500,000 shortfall was inaccurate.  Instead, the article described McNally as noting that UHH had known about the projected deficit since December 2007 and as complaining about the article.  McNally was reported to have said that she had been the Athletic Director for six years, instead of the erroneously reported eight; that she was working from home because Hong had told her that, for the sake of the staff, it might be better if McNally worked from home; and that two softball trips had been cancelled before the "budget crisis."  <u>Id.</u>

McNally is claiming in this lawsuit that the projected $500,000 figure was inaccurate, but provides no evidence to support that statement.  On the fifth page of her Opposition, McNally cites "Exhibit 49" for the proposition that an "EADA Report" by UHH to the NCAA in 2008 indicated that UHH's athletic department had no deficit.  The court could not find "Exhibit 49" in the record.  The same page of the Opposition says that pages 160 to 161 of Tseng's deposition also indicate that there was a balanced budget for 2008.  But those pages of the deposition show McNally's counsel asking an unanswered question regarding whether it would be a false statement to say that UHH had a $500,000 deficit if UHH had reported that it had a balanced budget.  Even

assuming that UHH did report to the NCAA that its budget was ultimately balanced, that does not mean that a deficit projected at the beginning of the year was inaccurate. At the hearing, McNally conceded that the alleged report to the NCAA was not made until October 2008, allowing for months of cost-cutting measures and fundraising to have offset the "deficit" projected at the beginning of the year.

On March 7, 2008, UHH, through its Chancellor, Rose Cheng, notified McNally that UHH was not renewing her executive appointment. Cheng said she was providing notice that the executive appointment was not being renewed pursuant to the amended Chapter 9-14 of the Board of Regents' Policies approved in January 2008. Cheng told McNally that her last day would be in September 2008. See Letter from Rose Y. Cheng to Kathleen McNally, March 7, 2008, ECF No. 39-3.

A copy of the amended Chapter 9-14 of the Board of Regents' Policies is in the court's record as ECF No. 39-4. According to section (f) of the policy, "Executive personnel who do not have return rights to another position shall be provided prior written notice of termination of employment." Because McNally had been employed as Athletic Director for more than two years, section (f) of the policy provided that UHH had to provide McNally with "six (6) months notice . . . prior to the effective date of the termination action." Section (f), as it appears in

the record, also provided, "Notice of termination may be given at any time during the appointment period." The parties agreed at the hearing, however, that this sentence was not actually part of the policy in effect in March 2008. There is no dispute that UHH provided McNally with at least six months' notice before her contract ended, paying her until September 2008. McNally nevertheless claims that she was effectively terminated when she was relieved of her duties in March 2008. See Letter from Rose Y. Cheng to Kathleen McNally, March 7, 2008, ECF No. 39-5.

In July 2008, McNally told UHH that her last day of employment would be September 5, 2008. See Letter from Kathleen McNally to Kerwin Iwamoto, July 22, 2008, ECF No. 39-6.

From early in McNally's appointment as UHH's Athletic Director, she had been told that having a balanced operating budget was important. See ECF No. 39-14 (setting as a goal for 2003-04 "Creat[ing] and maintain[ing] a balanced operating budget"); ECF No. 39-15 (same goal for 2004-05); ECF No. 39-16 (informing McNally that the 2005-06 academic year was expected to have many challenges, including fiscal challenges; suggesting that McNally curb money she spent on traveling; and noting that UHH had fundraising challenges and had to continue to move forward with Title IX compliance). McNally admitted in her deposition that she "was responsible for the oversight of the

11

total budget." <u>See</u> Deposition of Kathleen McNally at 153, Dec. 8, 2010, ECF No. 80-3.

III.    <u>MOTION FOR SUMMARY JUDGMENT STANDARD.</u>

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975, 988 (9th Cir. 2006). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 323. A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing

Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.

"A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."  Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be

enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

IV.    McNALLY'S REQUESTS TO CONTINUE THE MOTIONS ARE DENIED.

This court previously denied McNally's last-minute ex parte request for additional time to respond to Defendants' motions for summary judgment.  Since the denial of the previous request, McNally has submitted two more requests to continue the hearing on the motions.  See ECF Nos. 70 and 92.

Rule 56(d) of the Federal Rules of Civil Procedure (formerly Rule 56(f)), allows this court to defer consideration of a motion for summary judgment, allow time to obtain affidavits or declarations or to take discovery, or issue any other appropriate order whenever a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  The comments to the 2010 amendments to Rule 56 indicate that "Subdivision (d) carries forward without substantial change the provisions of the former subdivision (f)."  This court therefore applies case law concerning former Rule 56(f) to the present motion.

As the party requesting the continuance, McNally bears
the burden of (1) filing a timely application that specifically
identifies relevant information; (2) demonstrating that there is
some basis to believe that the information sought exists; and
(3) establishing that such information is essential to resist the
summary judgment motion.  See Employers Teamsters Local Nos. 175
& 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1130 (9th
Cir. 2004) (citation omitted); accord Moss v. U.S. Secret Serv.,
572 F.3d 962, 966 n.3 (9th Cir. 2009) (noting that Rule 56(f)
requires a party to show how additional discovery would preclude
summary judgment and why the party cannot immediately provide
specific facts demonstrating a genuine issue of material fact).

McNally failed to diligently pursue the requested
discovery.  See Pfingston v. Ronan Engineering Co., 284 F.3d 999,
1005 (9th Cir. 2002) ("The failure to conduct discovery
diligently is grounds for the denial of a Rule 56(f) motion.");
Nidds v. Schindler Elevator Corp., 113 F.3d 912, 921 (9th Cir.
1997 (no abuse of discretion when district court denied Rule
56(f) continuance for lack of diligence in taking discovery);
Conkle v. Jeong, 73 F.3d 909, 914 (9th Cir. 1995) ("the district
court does not abuse its discretion by denying further discovery
if the movant has failed diligently to pursue discovery in the
past"); Richardson v. City & County of Honolulu, 759 F. Supp.
1477, 1485-86 (D. Haw. 1991) ("[i]f the non-movants have had

15

ample time to conduct discovery, a continuance is not appropriate"). The Complaint in this matter was filed on August 7, 2009. The motions for summary judgment were filed on October 20, 2010. Counsel's declaration does not indicate when he started to take discovery. Instead, counsel merely says that he was unable to schedule depositions because, in December 2010, he had other matters that required his attention. Counsel says that he was unable to schedule depositions in the latter half of December 2010 because UHH was on winter break. But counsel does not appear to have noticed the depositions of Keith Miser, James DeMello, and Alyson Kakugawa-Leong until January 6 and 7, 2011, after his oppositions to the motions were due and only 11 or 12 days before the scheduled hearing on the present motions. Counsel does not explain why he did not take the requested discovery in the nearly year and a half since this case was filed or for more than a month after the motions were filed.

Counsel also fails to explain clearly what discovery would yield or what basis he has for believing that certain information exists that is essential to resisting the motions for summary judgment. For example, counsel says that he wants to depose James DeMello to prove that DeMello, not McNally, was responsible for improving the financial outlook of UHH's athletic department. The relevance of such proof to the present motions is unclear, as McNally admits that she "was responsible for the

16

oversight of the total budget." See Deposition of Kathleen McNally at 153, Dec. 8, 2010, ECF No. 80-3. Even assuming DeMello shared some blame for the projected deficit, McNally does not say that discovery would likely clear her of all blame such that she could raise a genuine issue of fact as to whether UHH's proffered reason for not renewing her executive appointment was a legitimate, nondiscriminatory reason or a pretext for discrimination. McNally also fails to demonstrate why the discovery is necessary, as McNally herself should have sufficient personal knowledge to submit a declaration on her job responsibilities, making the proposed discovery unnecessary in opposing the motions.

With respect to the deposition of Keith Miser that McNally would like to take, all McNally says is that his deposition "is crucial because he was the person who assigned James Demello to the position of Financial Office of the UH Althetic Department, and he knows that Mr. Demello was assigned to replace plaintiff." McNally does not explain why such testimony would be relevant to opposing the present motions.

McNally says that she needs to take the deposition of Luoluo Hong "because she carried out the termination of plaintiff by order of . . . Tseng." Again, McNally does not show why that fact is important to opposing the present motions for summary judgment. She does not, for example, state that she expects Hong

to testify that Tseng told Hong to "get back" at McNally because of McNally's gender discrimination complaints.

Finally, McNally seeks to depose Alyson Kukagawa-Leong, saying that she had accused McNally of creating a $500,000 deficit. While what Kukugawa-Leong may have said with respect to the deficit goes to the heart of McNally's defamation claim, the present motions do not turn on any dispute as to what was actually said. This means that what Kakugawa-Leong actually said does not go to genuine issues of material fact for purposes of these motions.

McNally is represented by an attorney who is often in this court. He certainly knows or should know the rules and obligations concerning motions practice before this court. On many occasions, however, McNally's counsel has failed to follow court rules governing matters such as the timely filing of documents or motions for continuances of hearings.[1] See, e.g., Matubang v. City & County of Honolulu, 2010 WL 1850184, *2 n.6 (D. Haw., May 7, 2010) (noting that an opposition had not been

---

[1]According to the court's Court Management/Electronic Case File system, McNally's counsel has been counsel of record 134 times in cases before this court. Despite his extensive federal court experience (and repeated sanctions), counsel in the present case continues to place undue burdens on opposing counsel and the court by presenting unsupported arguments and failing to comply with court rules. For example, McNally's counsel asserts race and age discrimination under Title IX when that statute is only applicable to gender discrimination. McNally's counsel presents claims in the Complaint, then abandons those claims when questioned about them by the court at a hearing.

timely filed); <u>Stucky v. Haw. Dep't of Educ.</u>, 2008 WL 1959758, *2
(D. Haw. May 6, 2008) (denying Rule 56(f) request because it was
filed one month after the hearing on the motion); <u>Mabson v. Ass'n
of Apartment Owners of Maui Kamaole</u>, Civ. No. 06-00235 DAE-LEK,
slip op. at 28 (D. Haw., Aug. 13, 2007) (noting that no
satisfactory explanation had been provided to the court for the
untimely filing of an opposition); <u>Kaulia v. County of Maui</u>, 504
F. Supp. 2d 969, 979 n.14 (D. Haw. 2007) (noting that the
opposition had been filed one day late); <u>Epileptic Found. v.
County of Maui</u>, 300 F. Supp. 2d 1003, 1006 n.3 (D. Haw. 2003)
(noting that an opposition had been filed one day late and that
declarations had been filed several days late); <u>Perkins v. City &
County of Honolulu</u>, Civ. No. 97-01551, slip op. at 5-6 (D. Haw.
Nov. 23, 1998) (order sanctioning counsel and listing eight other
cases in which local rules were not followed, including many
instances of failing to file timely oppositions); <u>see also
Shipley v. Haw.</u>, 2006 WL 2474059, *5 (D. Haw. Aug. 24, 2006)
(reminding counsel to file a timely opposition).  Given McNally's
counsel's earlier experiences with motions to continue hearings
to pursue discovery, he should be familiar with the Rule 56
procedures and requirements for such motions.  The failure to
follow such procedures and requirements is fatal to McNally's
requests to continue the hearing in this case.

V.        THE COURT STRIKES THE DECLARATIONS OF CHRISTINE GRANT.

On December 29, 2010, in support of her opposition to the motions for summary judgment, McNally filed the unsigned declaration of Christine Grant.  See ECF No. 72-2.  On January 2, 2011, McNally filed an ex parte motion asking the court to consider an amended and signed declaration of Christine Grant. See ECF No. 75.  The court denies that request and strikes Grant's declarations.

Rule 56(c)(4) of the Federal Rules of Civil Procedure, formerly Rule 56(e)(1), requires affidavits and declarations supporting or opposing a motion for summary judgment to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Grant's declarations do not satisfy this rule.

According to counsel for McNally, Grant is an "expert witness" who lives in Iowa.  See Declaration of Andre' S. Wooten ¶ 3, Jan. 2, 2011, ECF No. 75-1.  Grant purports to state facts relevant to the motions for summary judgment, but she does not explain how she has personal knowledge of those facts.  Grant says, for example, that McNally was mandated by UHH to add three sports to comply with Pacific West Conference requirements. Counsel for McNally argued at the hearing that Grant has personal knowledge of this fact because she has familiarized herself with

the conference bylaws.  That argument is unpersuasive, given indications that Grant relied on hearsay to determine what sports UHH participates in.

Grant's declarations are filled with instances in which she purports to have knowledge of facts that she does not appear to have personal knowledge about.  For example, although she does not say that she was employed by UHH, she purports to know that UHH told McNally to "progress toward compliance with Title IX" and that UHH did not provide any money to do so.

To the extent Grant's declarations give opinions or state conclusions of law, she does not demonstrate qualifications to be an expert in any field.  McNally has the burden of demonstrating the admissibility of Grant's "expert" opinions. Lust By & Through Lust v. Merrell Dow Pharms., Inc., 89 F.3d 594, 598 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility.").  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert evidence in this court.  See Clausen v. M/V New Carissa, 339 F.3d 1049, 1055 (9th Cir. 2003).  Rule 702 allows the admission of expert testimony when scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue.  Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the Supreme Court, focusing on the

admissibility of scientific expert testimony, found that such testimony is admissible only if it is both relevant and reliable. In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 146 (1999), the Court explained that the presiding judge's role (or gatekeeping function) in ensuring the reliability and relevancy of expert testimony extends to all expert testimony. See also Clausen, 339 F.3d at 1056 (noting that district courts are "charged . . . with the responsibility of ensuring that proffered [expert] evidence is both relevant and reliable").

Daubert outlined nonexclusive factors, such as testing, peer review and publication, error rates, and acceptance in the relevant scientific community, some or all of which might help a court to determine the reliability of a particular scientific theory or technique. Daubert, 509 U.S. at 593-94. The Daubert test is "flexible," and the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho, 526 U.S. at 141; see also Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 369 (9th Cir. 2005) (noting that the inquiry envisioned by Rule 702 is a flexible one that must be tied to the facts of each particular case); Elsayed Mukhtar v. Cal. St. Univ., Hayward, 299 F.3d 1053, 1064 (2002)

(stating that the court "has broad latitude in determining whether an expert's testimony is reliable" and "in deciding *how* to determine the testimony's reliability"), <u>as amended by</u> 319 F.3d 1073 (9th Cir. 2003).

Under <u>Daubert</u> and <u>Kumho</u>, Grant's testimony is admissible only if this court determines that she is qualified as an expert and that her testimony is reliable and relevant and will assist the trier of fact. McNally fails to satisfy this burden, as no information has been provided to the court about her qualifications or her assumptions. At the hearing, McNally represented that Grant had knowledge of conference bylaws, how conferences and athletic departments operate, and how hiring processes work at universities. Nothing in the record shows how extensive Grant's knowledge is or where or how that knowledge was acquired. The court is left to wonder whether Grant is claiming to know the intimate details of the hiring processes and athletic department operations at every university in the country, a feat of extreme difficulty. If Grant claims to have knowledge of every bylaw in every athletic conference, the court wonders how that knowledge would be helpful to the court, as the bylaws themselves could be submitted so that reliance on a person's memory of what the bylaws say would be unnecessary.

Given what has been submitted to the court, Grant appears to be an "expert" masquerading as a fact witness. Accordingly, Grant's declarations are stricken and disregarded.

VI.     ANALYSIS OF MERITS OF SUMMARY JUDGMENT MOTIONS.

        A.   Title IX.

Cause of Action I alleges that UHH and the Individual Defendants violated Title IX by discriminating against McNally based on her sex, race, and age, and by retaliating against her for the exercise of her rights under Title IX, 20 U.S.C. § 1681. See Complaint ¶¶ 32-34. At the hearing on the present motions, McNally dropped the Title IX claims against the Individual Defendants and clarified that she is asserting disparate treatment and retaliation claims under Title IX only against UHH.

Title IX provides in relevant part:

> (a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . . .

The Supreme Court has held that an implied cause of action exists under Title IX for retaliation. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").

Although the Ninth Circuit has not addressed the issue of how Title IX claims are to be handled, most courts look to Title VII when reviewing claims under Title IX. That is, the relevant analysis to be followed in connection with alleged employment discrimination on the basis of sex under Title IX is similar to that followed in Title VII. See, e.g., Johnson v. Baptist Med. Ctr., 97 F.3d 1070, 1072 (8th Cir. 1996) ("when a plaintiff complains of discrimination with regard to conditions of employment in an institution of higher learning, the method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case"); Murray v. N.Y. Univ. College of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII."); Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 896-99 (1st Cir. 1988) (applying Title VII burden-shifting analysis to Title IX claim); Bolla v. Univ. of Haw., 2010 WL 5388008, *9 (D. Haw., Dec. 16, 2010) (applying Title VII rubric to Title IX retaliation claim); Emeldi v. Univ. of Or., 2010 WL 2330190, *2 (D. Or., June 4, 2010) ("Title IX should be analyzed under the same burden shifting scheme recognized for Title VII cases."); Stucky v. Haw., 2008 WL 214944, *17 (D. Haw. Jan. 25, 2008) ("Title VII principles guide the resolution of Title IX

discrimination claims."). Following the reasoning set forth in those cases, this court applies the Title VII framework to this Title IX case.

Accordingly, to survive summary judgment on the Title IX claim, McNally must first establish a prima facie discrimination case. See, e.g., Anthoine v. N. Central Counties Consortium, 605 F.3d 740, 753 (9th Cir. 2010). If McNally makes out a prima facie case, the burden shifts to UHH to provide nondiscriminatory reasons for the adverse employment action-- UHH's decision not to renew her executive appointment. If UHH does so, the prima facie case "drops out of the picture," and this court evaluates the evidence to determine whether a reasonable jury could conclude that UHH discriminated against McNally. See Anthoine, 605 F.3d at 753. At that point, McNally may defeat summary judgment by offering direct and/or circumstantial evidence that a discriminatory reason more likely motivated the employer, or that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. See id. When the evidence on which a plaintiff relies is direct, little evidence is required to survive a summary judgment motion. EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009). However, when the evidence on which a plaintiff relies is circumstantial, "that evidence must be specific and substantial to defeat the

employer's motion for summary judgment." <u>Anthoine</u>, 605 F.3d at 753 (quoting <u>EEOC v. Boeing Co.</u>, 577 F.3d 1044, 1049 (9th Cir. 2009)). McNally may not defeat this motion for summary judgment merely by denying the credibility of UHH's proffered reason for the challenged employment action. <u>See</u> <u>id.</u>

### 1. No Individual Liability for Title IX Violations.

To the extent the Complaint asserts individual capacity Title IX claims, the Individual Defendants moved for summary judgment, arguing that "Title IX does not recognize individual liability." <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1170 n.12 (11th Cir. 2003); <u>accord</u> <u>Smith v. Metro. Sch. Dist. Perry Twp.</u>, 128 F.3d 1014, 1018 (7th Cir. 1997) (stating that "The majority of courts considering this issue also has concluded that only a grant recipient can violate Title IX" and that "we agree with the First Circuit's conclusion in <u>Lipsett</u> that a Title IX claim can only be brought against a grant recipient and not an individual"); <u>Jones v. Beverly Hills Unified Sch. Dist.</u>, 2010 WL 1222016, *6 (C.D. Cal., Mar. 24, 2010) (dismissing Title IX claims asserted against individual defendants because there is no individual liability under Title IX); <u>Sherez v. State of Hawaii Dep't of Educ.</u>, 396 F. Supp. 2d 1138, 1145 (D. Haw. 2005) (dismissing individual capacity claims under Title IX because Title IX is directed only at the recipients of federal funding). McNally does not oppose summary judgment on this point and, in

fact, abandoned the individual capacity Title IX claims at the hearing, stating that she is not seeking to hold the Individual Defendants liable for the alleged Title IX violations.

### 2. Title IX Does Not Prohibit Discrimination Based on Race or Age.

To the extent McNally asserts race or age discrimination in violation of Title IX, summary judgment is granted in favor of Defendants because Title IX only protects against discrimination based on sex and not on race or age.  See 20 U.S.C. § 1681 (prohibiting discrimination based on sex); Mwabira-Simera v. Howard Univ., 692 F. Supp. 2d 65, 70-71 (D.D.C. 2010) ("Title IX does not address race or disability discrimination, which are the only types of discrimination the plaintiff alleges in his amended complaint or attempts to support in his subsequent submissions on the record.  Therefore, the Title IX claim will be dismissed because it also does not state a claim upon which relief may be granted.").  Again, McNally does not oppose summary judgment on her claims of race and age discrimination under Title IX.

### 3. McNally Does Not Demonstrate a Prima Facie Title IX Violation.

#### a. Disparate Treatment.

For McNally to establish a prima facie case of disparate treatment in violation of Title IX, McNally must "show that (1) she belongs to a protected class; (2) she was qualified

28

for her job; (3) she suffered an adverse employment action; and (4) her employer treated her differently than a similarly situated individual not belonging to her protected class." Stucky v. Hawaii, 2010 WL 1372317, *2 (D. Haw. Mar. 31, 2010) (citing Cornwell v. Electra Cent. Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (discussing prima facie Title VII case)).

McNally says she was treated differently than the Athletic Director of UHM, who was male and was paid more than McNally (and might have had a multi-year contract). McNally does not demonstrate a prima facie case of disparate treatment in violation of Title IX, as she fails to show that she was similarly situated to a person who was treated more favorably than her. While McNally compares herself to the Athletic Director of UHM, McNally and the AD of UHM were not similarly situated.

UHM is much larger than UHH and has a larger budget. UHM has seven men's sports, eleven women's sports, and two coed sports competing on the NCAA Division I level. UHM has an enrollment of approximately 20,000 students. UHH, on the other hand, has six mens' and seven womens' sports competing on the NCAA Division II level. UHH has an approximate enrollment of just under 4,000 students. See Letter from Kerwin Iwamoto to Kathleen McNally, Oct. 10, 2006, ECF No. 39-12; http://manoa.hawaii.edu/about/ (describing UHM enrollment and

NCAA Division I affiliation); http://www.hawaiiathletics.com/ (describing UHM athletics); http://hiloathletics.com/ (describing UHH athletics); http://hiloathletics.com/sports/2010/6/2/ quick%20facts.aspx?path=general (listing enrollment and NCAA Division II affiliation).

Because McNally fails to show that she and the Athletic Director for UHM are similarly situated, McNally fails to make out a prima facie case of disparate treatment based on UHH's failure to pay her as much as the Athletic Director at UHM and UHH's failure to give her a multi-year contract.

b.    Retaliation.

For McNally to establish a prima facie case of Title IX retaliation, she must show that: (1) she engaged in protected activity; (2) she was thereafter subjected to an adverse action; and (3) a causal link exists between the protected activity and the adverse action.  See Wallis v. J.R. Simplot Co., 26 F.3d 885, 891 (9th Cir. 1994).  On this motion for summary judgment, the requisite degree of proof necessary to establish a prima facie case is "minimal."  See Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1148 (9th Cir. 1997) (discussing prima facie case in Title VII context).  The Ninth Circuit notes that a plaintiff makes a prima facie showing even if his or her case is "weak." Costa v. Desert Palace, Inc., 299 F.3d 838, 855 (9th Cir. 2002).

McNally says that she complained about gender
inequities for purposes of Title IX when she sent letters asking
for a salary review because the Athletic Director at UHM made
significantly more than she did and because she had not been
given a multi-year contract.  This salary review request does not
appear to be an assertion of viable rights under Title IX,
despite McNally's characterization.  Even assuming that McNally
did engage in protected activity in complaining about perceived
Title IX violations, she does not make out a prima facie case.

McNally claims to have complained about Title IX
violations in October 2006 (and in the three years before that).
She says that UHH responded by retaliating against her when,
fifteen to eighteen months later, it told her that her executive
appointment was not going to be renewed.  She says she was
further retaliated against when the press was later allegedly
told why her executive appointment was not being renewed.
McNally further claims that UHH retaliated against her by using
money for non-Title IX matters after McNally was no longer
associated with UHH.

McNally fails to establish a causal link between the
protected activity--the alleged Title IX complaints--and the
retaliation.  She appears to be relying only on the sequence of
events.  That is, she says she complained, and bad things
followed fifteen to eighteen months later.  But the period of

fifteen to eighteen months between events is too long to suggest a causal link.  See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . . . Action taken (as here) 20 months later suggests, by itself, no causality at all."); Manatt v. Bank of Am., 339 F.3d 792, 802 (9th Cir. 2003) (refusing to draw inference of causation when there was a nine-month period between the employer's knowledge of protected activity and an adverse employment action).  Absent evidence other than the delayed sequence of events, McNally does not establish causation.

### 4.    UHH Had Legitimate, Nondiscriminatory Reasons for its Conduct.

Even assuming McNally could be said to make out a prima facie Title IX violation, UHH has articulated legitimate, nondiscriminatory reasons for not having renewed McNally's executive appointment.  McNally, the person ultimately responsible for keeping the athletic department within budget, had been warned to stay within budget.  Despite that warning, UHH projected that the athletic department would exceed its budget by nearly half a million dollars.  UHH says that it did not renew McNally's executive appointment because the department that she managed demonstrated an inability to stay within its budget.

32

5.  Pretext.

McNally's opposition does not discuss pretext, except
in passing on the last page, where she calls Defendants' actions
a pretext.  It does not appear that she is attempting to
establish pretext by showing that UHH's proffered explanation for
not renewing her executive appointment is unbelievable because it
is internally inconsistent.  Instead, McNally appears to be
attempting to show pretext through circumstantial evidence that
the proffered reasons were on their face not believable and/or
that a discriminatory reason more likely motivated UHH's conduct.
McNally fails to provide "specific and substantial" evidence to
create an issue of fact using this method of establishing
pretext.  See Anthoine, 605 F.3d at 753.

At the hearing, for example, McNally argued that her
evidence of pretext is the communication to the press that there
was a "projected deficit" of $500,000 in late 2007 or early 2008.
McNally noted that UHH told the NCAA in October 2008 that it had
a balanced budget.  This argument does not provide the necessary
"specific and substantial" evidence.  As discussed above, McNally
does not actually provide the court with admissible evidence that
UHH told the NCAA in October 2008 that it had a balanced budget.
Even assuming UHH did report a balanced budget to the NCAA in
October 2008, McNally has failed to explain why the deficit
projected in late 2007 and early 2008 was false, as opposed to

33

having been reasonably projected but ultimately avoided.  McNally

does not point to admissible evidence in the record, for example,

indicating that, at the time the alleged statements of the

projected deficit were made, UHH expected to get or should have

known about a possible large donation that might cut that

deficit.  McNally does not raise a genuine issue of fact as to

whether the "projected deficit" statements were not believable by

simply pointing to an allegedly balanced budget approximately ten

months after a deficit had been projected.

> B.   The Eleventh Amendment Bars Money Damage Claims
>      Asserted Against UHH and the Individual Defendants
>      in their Official Capacities.

In Causes of Action II and III, McNally asserts

violations of 42 U.S.C. §§ 1981, 1981a, and 1983.  Under 42

U.S.C. §§ 1981 and 1983, "discrimination based on race, ethnic

background, ancestry, and/or national origin committed under

color of law" is generally prohibited.  Mustafa v. Clark County

Sch. Dist.  157 F.3d 1169, 1180 (9th Cir. 1998).  Compensatory

and punitive damages in certain cases involving intentional

discrimination in employment are provided by 42 U.S.C. § 1981a.

To the extent Causes of Action II and III seek money

damages from UHH or from the Individual Defendants in their

official capacities, Eleventh Amendment immunity bars such

claims.  Under the Eleventh Amendment, a state is immune from

certain actions brought in federal court by her own citizens or

citizens of other states.  <u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100, 106 (1984); <u>Mitchell v. Los Angeles Cmty. Coll. Dist.</u>, 861 F.2d 198, 201 (9th Cir. 1989).  Federal court actions against agencies or instrumentalities of a state are also barred by the Eleventh Amendment.  <u>Shaw v. State of Cal. Dept. of Alcoholic Beverage Control</u>, 788 F.2d 600, 603 (9th Cir. 1986).  A suit against state officials in their official capacities is the same as a suit against the state itself and therefore is subject to the Eleventh Amendment.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166-67 (1985).  Unless the state unequivocally waives sovereign immunity or Congress exercises its power under the Fourteenth Amendment to override the immunity, the state, its agencies, and its officials (acting in their official capacities) are immune from suit under the Eleventh Amendment.  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 66 (1989); <u>Pennhurst</u>, 465 U.S. at 99.

McNally does not contest that UHH is an agency or instrumentality of the State of Hawaii such that UHH may avail itself of Eleventh Amendment immunity.  <u>See</u> <u>Mukaida v. Hawaii</u>, 159 F. Supp. 2d 1211, 1220-22 (D. Haw. 2001) (determining UHM to be an "arm of the state" such that it had Eleventh Amendment immunity).  McNally also does not claim that, with respect to the §§ 1981, 1981a, and 1983 claims, Hawaii unequivocally waived its immunity from those claims.  <u>See</u> <u>Will</u>, 491 U.S. at 66.  Nor does

McNally assert that UHH waived that immunity by failing to assert it.  See  Bliemeister v. Bliemeister (In re Bliemeister), 296 F.3d 858, 861 (9th Cir. 2002) (calling Eleventh Amendment immunity quasi-jurisdictional in that it is waivable when a state fails to assert it).  With respect to the §§ 1981, 1981a, and 1983 claims, the Eleventh Amendment bars McNally's money damage claims unless Congress abrogates that immunity.  Congress has not done so.  See Mitchell v. Los Angeles Cmty. College Dist., 861 F.2d 198, 201 (9th Cir. 1988) (holding that the Eleventh Amendment bars §§ 1981 and 1983 claims); Shaughnessy v. Hawaii, 2010 WL 2573355, *5 (D. Haw., June 24, 2010) (noting that § 1981 does not abrogate the states' Eleventh Amendment immunity); Shipley v. Hawaii, 2006 WL 1582431, *3 (D. Haw., June 2, 2006) (noting that Congress did not abrogate the states' Eleventh Amendment immunity with respect to §§ 1981 and 1983 claims); Yowman v. Jefferson Cnty. Cmty. Supervision & Corrs. Dept., 370 F. Supp. 2d 568, 588 (E.D. Tex. 2005) (holding that the Eleventh Amendment bars §§ 1981 and 1981a claims).

        McNally does not oppose dismissal of the §§ 1981, 1981a, 1983 claims for money damages based on the Eleventh Amendment, arguing instead that the claims should not be dismissed because she is seeking prospective injunctive relief. In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court recognized that a "suit challenging the constitutionality of a

state official's action is not one against the State." <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 103 (1983) (citing <u>Young</u>).

Under the <u>Ex Parte Young</u> doctrine, the federal court may enjoin a state official's future conduct when a plaintiff brings suit alleging a violation of federal law, <u>Edelman v. Jordan</u>, 415 U.S. 651 (1974), but not when a plaintiff alleges a violation of state law. <u>Pennhurst</u>, 465 U.S. at 106 (stating that "when a plaintiff alleges that a state official has violated <u>state</u> law," then "the entire basis for the doctrine of <u>Young</u> . . . disappears"); <u>see also</u> <u>Will</u>, 491 U.S. at 71 n.10 ("a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state'") (quoting <u>Kennedy v. Graham</u>, 473 U.S. 159, 167 n.14 (1985)); <u>Los Angeles County Bar Ass'n v. Eu</u>, 979 F.2d 697, 704 (9th Cir. 1992) (noting that the Eleventh Amendment is not a bar to "actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities").

The <u>Ex Parte Young</u> doctrine is inapplicable when a claim is asserted against a state or a state agency, as opposed to against a state official. <u>See</u> <u>In Re Pegasus Gold Corp.</u>, 394 F.3d 1189, 1195 (9th Cir. 2005) (stating that "agencies of the

state are immune from private damage actions or suits for injunctive relief brought in federal court"); <u>Apisaloma v Hawaii</u>, 2009 WL 294551, *1 n.2 (D. Haw., Feb. 5, 2009) (noting that the <u>Ex Parte Young</u> exception is inapplicable in suits against states or state agencies).

The <u>Ex Parte Young</u> doctrine does not allow McNally's claims for prospective injunctive relief to go forward against UHH or allow the state-law claims to go forward against the Individual Defendants in their official capacities.

With respect to the §§ 1981, 1981a, and 1983 claims for prospective injunctive relief against the Individual Defendants in their official capacities, McNally clarified at the hearing that the only prospective injunctive relief she is seeking is to have the court order Defendants to refrain from further communications about the alleged $500,000 projected budget deficit.  McNally is not seeking reinstatement.

To the extent McNally is asserting official capacity claims for prospective injunctive relief against the Individual Defendants, such claims cannot be maintained against Tseng in her official capacity, because Tseng is no longer employed by UHH. <u>See</u> Deposition of Rose Tseng at 5, Dec. 14, 2010, ECF 80-6 (indicating that Cheng retired as Chancellor on June 30, 2010). This leaves official capacity prospective injunctive relief claims against Miser, Chen, and Hong.

To the extent McNally seeks prospective injunctive relief against Miser, Chen, and Hong under § 1981, summary judgment is granted in favor of those Defendants. Section 1981 states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Because McNally does not present any facts supporting a race discrimination claim, she cannot maintain her § 1981 claim for prospective injunctive relief.

To the extent McNally seeks prospective injunctive relief against Miser, Chen, and Hong under § 1981a, summary judgment is granted in favor of those defendants. Section 1981a states:

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C.A. §§ 2000e-2, 2000e-3, or 2000e-16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section

> 706(g) of the Civil Rights Act of 1964, from
> the respondent.

42 U.S.C. § 1981(a). Because McNally is not bringing a claim

"under section 706 or 717 of the Civil Rights Act of 1964 [42

U.S.C.A. §§ 2000e-5 or 2000e-16]" against a Defendant "who

engaged in unlawful intentional discrimination . . . prohibited

under section 703, 704, or 717 of the Act [42 U.S.C.A. §§

2000e-2, 2000e-3, or 2000e-16]," § 1981a is simply inapplicable.

Finally, to the extent McNally seeks prospective

injunctive relief against Miser, Chen, and Hong under § 1983,

summary judgment is granted in favor of those Defendants.

Section § 1983 provides:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in
> equity, or other proper proceeding for
> redress, except that in any action brought
> against a judicial officer for an act or
> omission taken in such officer's judicial
> capacity, injunctive relief shall not be
> granted unless a declaratory decree was
> violated or declaratory relief was
> unavailable. For the purposes of this
> section, any Act of Congress applicable
> exclusively to the District of Columbia shall
> be considered to be a statute of the District
> of Columbia.

For McNally to succeed on her § 1983 claim, she must prove:
"1) that a person acting under color of state law committed the
conduct at issue, and 2) that the conduct deprived the claimant
of some right, privilege or immunity protected by the
Constitution or laws of the United States." Leer v. Murphy, 844
F.2d 628, 632-33 (9th Cir. 1988). To the extent McNally says
that she was deprived of equal protection rights, she fails to
demonstrate that she was treated less favorably than a similarly
situated person. As described above, the Athletic Director of
UHM is not similarly situated to the Athletic Director of UHH.
To the extent McNally bases her § 1983 claim on a violation of
Title IX, the § 1983 claim fails for the reasons set forth above
with respect to the Title IX claim.

        C.   State Law Causes of Action.

      In Cause of Action IV, McNally alleges that her rights
under article X, section 1, of the Hawaii constitution, which
prohibits discrimination in public education based on race,
religion, sex, and ancestry, were violated. McNally clarified at
the hearing that she is not bringing a claim directly under the
state constitution, but is instead limiting her claim to an
alleged violation of section 378-2 of the Hawaii Revised
Statutes. McNally further clarified at the hearing that this
claim is not being asserted against Kakugawa-Leong and is instead
limited to UHH, Tseng, Miser, and Chen.

In Cause of Action V, McNally claims that the
Individual Defendants intentionally inflicted emotional distress
on her.  She clarified at the hearing that she is asserting this
IIED claim based on the alleged wrongful termination and the
alleged false statements made in announcing her termination.
Under Hawaii law, "the elements of the tort of intentional
infliction of emotional distress are 1) that the act allegedly
causing the harm was intentional or reckless, 2) that the act was
outrageous, and 3) that the act caused 4) extreme emotional
distress to another."  Hac v. Univ. of Haw., 102 Haw. 92, 106-07,
73 P.3d 46, 60-61 (2003).

In Cause of Action VI, McNally claims that the
Individual Defendants committed slander and libel.  Hawaii views
claims for slander and libel under the defamation rubric.  See
Bauernfiend v. AOAO Kihei Beach Condominiums, 99 Haw. 281, 282
n.2, 54 P.3d 452 n.2, 453 (Haw. 2002) (defamation actions are
governed by HRS § 657-4 (1993), which provides that "[a]ll
actions for libel or slander shall be commenced within two years
after the cause of action accrued, and not after"); see also
Rodney A. Smolla, Law of Defamation § 1:11, at 1-32 (2d ed. 2010)
("[L]ibel is defamation by written or printed words . . . slander
consists of communication of a defamatory statement by spoken
words"); Dan B. Dobbs, The Law of Torts § 401, at 1120 (2001)
("Defamation by writing and by contemporary means analogous to

writing such as movies is libel. Defamation communicated orally is slander.").

To prove defamation under Hawaii law, McNally must establish four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) negligence by the publisher; and (4) either actionability of the statement irrespective of special harm, or the existence of special harm caused by the publication. <u>See</u> <u>Wilson v. Freitas</u>, 121 Haw. 120, 128, 214 P.3d 1110 (App. 2009). "A communication is defamatory when it tends to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." <u>Fernandes v. Tenbruggencate</u>, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (Haw. 1982) (citing Restatement (Second) Torts § 559 (1977)). The <u>Fernandes</u> court explained that, "[w]hether a communication is defamatory 'depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place.'" <u>Id.</u> A person who publishes a false defamatory communication is subject to liability only if he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them. <u>See</u>

Restatement (Second) Torts § 580B.  Even assuming McNally could
assert a viable defamation claim, such a claim fails, as
discussed below.

### 1.   Official Capacity State-Law Claims.

With respect to claims based on state law, the Eleventh
Amendment completely immunizes states, state agencies, and state
officials sued in their official capacities from state-law claims
brought in federal court.  <u>Pennhurst</u>, 465 U.S. at 106, 117.
Accordingly, to the extent McNally seeks money damages and/or
prospective injunctive relief via the state-law claims against
the Individual Defendants in their official capacities, those
claims are barred by the Eleventh Amendment absent some waiver by
Hawaii.  <u>See</u> <u>Windward Partners v. Ariyoshi</u>, 693 F.2d 928, 929-30
(9th Cir. 1982) (applying Eleventh Amendment to bar claim for
money damages for an alleged violation of the Hawaii
constitution); <u>Bator v. Hawaii</u>, 910 F. Supp. 479, 484-85 (D. Haw.
1995) (holding that the Eleventh Amendment bars claims under
section 378-2 of the Hawaii Revised Statutes).

McNally does not point to any waiver of Eleventh
Amendment immunity applicable to the state-law claims in this
case.  Nor could the court locate such a waiver.  The State of
Hawaii has only waived its sovereign immunity with respect to
certain types of suits.  In section 661-1 of the Hawaii Revised
Statutes, for example, Hawaii consents to being sued for monetary

44

relief for violations of state statutes, state regulations, and contracts entered into with the state. <u>See</u> Haw. Rev. Stat. § 661-1. "However this statute does not extend consent to suits in federal court." <u>Office of Hawaiian Affairs v. Dep't of Educ.</u>, 951 F. Supp. 1484, 1491 (D. Haw. 1996). Similarly, in chapter 662 of the Hawaii Revised Statutes, Hawaii consents to being sued in tort actions. "However this provision also does not operate as a waiver . . . to suit in federal court." <u>Id.</u>; <u>see also</u> <u>Doe ex rel. Doe v. State of Haw. Dep't of Educ.</u>, 351 F. Supp. 2d 998, 1018 (D. Haw. 2004) ("Although the State of Hawaii generally waives . . . sovereign immunity as to torts of its employees in the Hawaii State Tort Liability Act, H.R.S. ch. 662, this waiver only applies to claims brought in state courts and does not constitute a waiver of the State's Eleventh Amendment immunity."); <u>Pahk v. Hawaii</u>, 109 F. Supp. 2d 1262, 1268 (D. Haw.2000) ("Although the State of Hawaii consents to being sued in tort actions[,] . . . that consent applies only to cases brought in the state courts of Hawaii, not to cases brought in federal courts."); <u>cf.</u> <u>Fordyce v. City of Seattle</u>, 55 F.3d 436, 441 (9th Cir. 1995) ("Although [a state] may waive the protection of the Eleventh Amendment's jurisdictional bar by passing a statute consenting to be sued, a statute consenting to suit in state court does not constitute consent to suit in federal court.").

2.   Individual Capacity State-Law Claims.

The Individual Defendants argue that the individual capacity state-law claims are barred by section 304A-108 of the Hawaii Revised Statutes, which states, "Notwithstanding any other law to the contrary, all claims arising out of the acts or omissions of the university or the members of its board of regents, its officers, or its employees . . . may be brought only pursuant to this section, and only against the university." The Individual Defendants argue that, pursuant to this statute, McNally's state-law claims may only be asserted against UHH. McNally does not contest the applicability of section 304A-108. Accordingly, the court grants summary judgment on the individual capacity state-law claims.

McNally opposes the motion only by arguing that there is individual liability for actions under section 378-2 of the Hawaii Revised Statutes.  This judge has already rejected that argument in a case affirmed by the Ninth Circuit Court of Appeals.  See Lum v. Kauai County Council, 2007 WL 3408003, *13 (D. Haw. 2007) (holding that there is no individual liability under section 378-2, except for claims seeking liability for aiding and abetting), aff'd 358 Fed. Appx. 860, 862 (9th Cir. 2009) (affirming district court ruling and stating that "there is no individual liability under Hawaii Revised Statutes § 378-2(1)(A) and (2)").

Although McNally does not appear to be making the argument, even if McNally's claim could be read as an aiding and abetting claim under section 378-2(3), her claim for individual liability would fail. Just as her gender discrimination claims under Title IX fail when the court applies the burden-shifting analysis to those claims, McNally's gender discrimination claims under chapter 378 of the Hawaii Revised Statutes fail for the same reasons. See Schefke v. Reliable Collection Agency, Ltd., 96 Haw. 408, 426, 32 P.3d 52, 70 (2001) (applying McDonnell Douglas burden-shifting analysis to claims asserted under section 378-(2) and (3) of the Hawaii Revised Statutes).

Moreover, the Individual Defendants also have qualified immunity with respect to McNally's individual capacity state-law claims. Although the Individual Defendants argue qualified immunity under Saucier v. Katz, 533 U.S. 194 (2001), and its progeny, Hawaii law provides a similar qualified immunity defense for state and local officials sued under state law. Under Hawaii law, a nonjudicial governmental official performing a public duty enjoys the protection of what has been termed a qualified or conditional privilege. See Towse v. Hawaii, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982). This privilege effectively shields the official from liability, and not from the imposition of the suit itself, to the extent that the privilege is not abused and thereby lost. Id. For an action to lie against an official

acting under a claim of privilege, it is essential that the
injured party allege and prove that the official was motivated by
malice and not by an otherwise proper purpose.  Id.  If, in
exercising his or her official authority, the public official was
motivated by malice, and not by an otherwise proper purpose,
Hawaii law provides that the cloak of immunity is lost, and the
official must defend the suit the same as any other defendant.
Marshall v. University of Hawaii, 9 Haw. App. 21, 37, 821 P.2d
937, 946 (Ct. App. 1991), not followed on other grounds, Takaki
v. Allied Mach. Corp., 87 Haw. 57, 951 P.2d 507 (1998). Because
the existence of malice is generally for the jury, judgment
without a trial on the state tort claims is only proper on
qualified immunity grounds when malice has been removed from the
case by uncontroverted affidavits or depositions.  See id.  In
this case, McNally does not sufficiently allege or raise any
issue of fact as to malice.

McNally argues only that the manner in which she was
terminated demonstrates malice.  However, McNally does not
sufficiently explain what she means by that argument.  To the
extent McNally says the newspaper article describing the $500,000
projected deficit is evidence of malice because it contained
inaccuracies, McNally raises no genuine issue of fact as to
malice.  See Paul Freelend, Vulcans facing budget shortfall, Haw.
Tribune Herald, March 1, 2008, at B1 and B4, ECF No. 72-7.

McNally introduces no evidence indicating that any particular Defendant actually told the reporter the deficit was about $500,000 and the story itself does not state where the figure came from.  See id.  Nor has McNally shown that, at the time the story was written, any statement projecting a $500,000 deficit was false.

### 3. Punitive Damage Claims.

Because no claims on which punitive damages may be based remain, summary judgment is granted in favor of the Individual Defendants on the punitive damage claims.  See Bailey v. U.S., 289 F. Supp. 2d 1197, 1213 (D. Haw. 2003) ("Because partial summary judgment is granted in favor of the Shell Defendants on Plaintiffs' substantive claims against them, Plaintiffs' derivative claims of punitive damages asserted against the Shell Defendants also fail."); Gold v. Harrison, 88 Haw. 94, 103, 962 P.2d 353, 362 (1998) ("The Plaintiffs' claims of false light/invasion of privacy, punitive/exemplary damages, intentional infliction of emotional distress, and negligence were all derivative claims based on the Plaintiffs' claim that Harrison's Statement was defamatory, and, as Harrison's Statement was not defamatory, these claims must also fail.")).

VII.     CONCLUSION.

For the reasons set forth above, the court denies McNally's requests for a continuance of the motions to take

discovery, strikes the declarations of Christine Grant, and grants the motions for summary judgment.

The Clerk of Court is directed to enter judgment against McNally and in favor of Defendants.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 28, 2011.



    /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

McNally v. University of Hawaii; Civil No. 09-00363 SOM/KSC; ORDER DENYING MOTIONS TO CONTINUE; ORDER STRIKING PLAINTIFF'S EXPERT; ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT